Hough, J.
The issues tendered by the record, treated in reverse order, challenge the legality of the proceedings of the city after the passage of the “ordinance to proceed,” no question being made that the “resolution of necessity,” publication thereof, notice to property owners thereunder, and the ordinance to proceed, were not in accordance with law.
In passing upon the questions contended for it will be necessary to consider the following in regular order:
1. Was the first contract valid, or invalid?
2. If valid, could it be rescinded; and, if so, was it rescinded?
3. Was the second contract valid, or invalid?
4. Was the method adopted by the city to construct the railway’s portion of the work a legal exercise of authority?
1. The publication of the “ordinance to proceed,” as it appeared in one of the newspapers, contained a mistake. Section 3 of the ordinance, as passed, read, “That the whole cost of said improvement, less one-half thereof, and the cost of intersections,” etc., while, as printed in one of the newspapers, the same extract read, “That [the whole cost of said improvement, less one-fiftieth thereof, and the cost of intersections,” etc.
This was a repaving improvement. Section 3822, General Code, reads as follows: “When *85 a special assessment for the improvement of a street or other public place has been levied and paid, the property so assessed shall not again be assessed for more than one-half the cost and expense of repaving or repairing such street or other public place unless the grade thereof is changed.”
It is claimed that because of this mistake there was such a defect in the publication as to invalidate subsequent proceedings under the ordinance; or, in other words, this defect is claimed to be fatal, invalidating the first contract.
For such contention to avail it must appear that the mistake is one touching some vital and necessary part of the ordinance. Inquiry then must be made into just what the requirements of the statute are.
Section 3825, General Code, reads:
“If the council decides to proceed with the improvement, an ordinance for the purpose shall be passed. Such ordinance shall set forth specifically the lots and lands to be assessed for the improvement, shall contain a statement of the general nature of the improvement, the character of the materials which may be bid upon therefor, the mode of payment therefor, a reference to the resolution theretofore passed for such improvement with date of its passage, and a statement of the intention of council to proceed therewith in accordance with such resolution and in accordance with the plans, specifications, estimates and profiles provided for such improvement.”
An examination of the publication discloses that it contains, first, a recitation of the lots and lands *86 to be assessed; second, a.statement of the general nature of the improvement; third, a statement of the character of the materials to be bid upon; fourth, of the mode of payment therefor; fifth, a reference to the declaratory resolution; and, sixth, a declaration on the part of council to proceed.
Of the various necessary elements to be complied with, the fourth, “the mode' of payment therefor,” appears to be the only one that could have even a remote connection to the mistake made. It is not believed, however, that this fourth element refers to the percentage of the cost to be assessed against the abutting property owners, but rather to whether or not the assessments shall be'paid in cash or in installments, and, if in installments, how many.
Of course, in a repaving improvement, under Section 3822, General Code, the city could not finally collect the assessment against any property for more than fifty per cent, of the cost, less the cost of intersections. The city’s determination to charge and collect a greater assessment than that provided by law would not be conclusive until the passage of the assessing ordinance and service of notice thereunder. (Section 3895, General Code.) If the city should attempt to carry a greater amount into the assessment ordinance than that allowed by law, a party aggrieved would have his remedy to enjoin the collection of the excess. An illegal percentage appearing in the publication under the “ordinance to proceed” is, however, in no way conclusive that that mistake will be carried into the assessing ordinance. Lippert v. Toledo, 9 C. C., N. S, 455, affirmed 76 Ohio St., 568.
*87 The conclusion then is that such mistake is not a fatal defect, and, that being the only question raised in reference to the validity of the first contract, it necessarily follows that in so far as the proceedings of the proper officers of the city of Newark, leading up to the making of the contract, are concerned, the first contract must be held to be valid.
2. The next question with which we are concerned is whether or not the first contract was rescinded.
The board of control on the 20th day of November, 1918, passed a resolution in regular form rescinding that contract, for reasons in said resolution set out, in substance that the contractor had been unable, although willing, to proceed with the work, because of the inability of the railway company to get ties and rails by reason of the regulations enforced by the federal priorities board on account of war conditions; and, further, that because of this condition the city engineer having charge of the work had prevented the contractor from proceeding.
The action of the board of control in its attempt to rescind the contract, and the reasons assigned for that action, appear to us to be entirely justifiable under the existing circumstances. Those circumstances made it impossible for the contractor to perform, and the city engineer having charge of the work very properly denied the right of the contractor to proceed until such time as ties and rails could be obtained, and the tracks placed in their new position.
*88 The delay occasioned the contractor for a period of eighteen months, subjecting it to great expense in one way or another, was sufficient cause on the part of the board of control, in an effort to protect the city against probable damage, to annul the contract, if it had the power so to do.
A copy of this resolution was sent to council, where it was filed, and no action taken in reference to the subject-matter thereof. This course was taken, so far as it appears, in good faith and without any charge of fraud or collusion on the part of anybody. We are therefore confronted with the question whether or not the board of control had the power to do what it attempted to do.
The board of control comes into being by virtue, of Section 4402, General Code. Its authority in respect to contracts is conferred by Section 4403, General Code, which is in part as' follows:
“No contract in the department of public service * * * in excess of five hundred dollars shall be awarded except on the approval of the board of control, which shall direct the director of the appropriate department to enter into the contract.”
The power to make a contract on behalf of a city is given the director of public service under Section 4328, General Code. These city officials have such power, and only such power, as is given them by the legislature. We find that the director of public service is given the authority to alter or modify a contract by Section 4331, General Code, which reads as follows:
“When it becomes necessary in the opinion of the director of public service, in the prosecution of any *89 work or improvement under contract, to make alterations or modifications in such contract, such alterations or modifications shall only be made upon the order of such director, but such order shall be of no effect until the price to be paid for the work and material, or both, under the altered or modified contract, has been agreed upon in writing and signed by the contractor and the director on behalf of the corporation, and approved by the board of control, as provided by law.”
We find, then, that the director of public service, with the approval of the board of control, has the power, during the progress of an improvement, for instance the repaving of a street, to make alterations and modifications in that contract. This power, however, cannot be considered one to absolutely rescind, annul, or wipe out a contract regularly made, and we find no such authority given by the legislature.
Then, how about the power of council to rescind a contract?
There is no expression of the legislature giving council the power to annul or rescind such a contract. General powers of council are found in Section 4211, which, in part, reads:
“The powers of council shall be legislative only, and it shall perform no administrative duties whatever * * *. All contracts requiring the authority of council for their execution shall be entered into and conducted to performance by the board or officers having charge of the matters to which they relate, and after authority to make suc.h *90 contracts has been given and the necessary appropriation made, council shall take no further action thereon.”
It would seem from a reading of this section that after the passage of the ordinance to proceed council would have no further duty to perform in reference to the making or execution of a contract for street improvement.
Let us further examine Section 4328, General Code:
“The director of public service may make any contract or purchase supplies or material or provide labor for any work under the supervision of that department not involving more than five hundred dollars. When an expenditure within the department, other than the compensation of persons employed therein, exceeds five hundred dollars, such expenditure shall first be authorised and directed by ordinance of council.”
It is therefore apparent that a contract such as we have here, involving as it does an expenditure of more than $500, before it is made or may be made, must be authorised and directed by ordinance of council.
The first contract was authorized and directed by Section 5 of “the ordinance to proceed.” Council authorized and directed the execution of a contract, but it did not authorize and direct the execution of more than one contract; that is to say, when the director of public service, with the direction and approval of the board of control, entered into a contract under the authorization and direction of *91 council, such director was concluded from entering into any other contract covering the same subject-matter, without the affirmative and proper authorization and direction of council to make such other contract; and this position is strengthened by Section 4211, General Code — council must first authorize and direct, and having so done, its duty is completed, on the theory that the contract so authorized and directed is the contract and the only contract authorized and directed.
Now, as before stated, there is no authority conferred by statute upon a director of public service or a board of control, or both, to rescind a contract. Neither is there any specific authority for council so to do. There is, however, a general fundamental rule of law that between principals the power to make a contract carries with it the general power to unmake it. This general principle is sound, and we can conceive no reason why it cannot be applied to municipalities; if properly applied. A contract for a street improvement, on the part of the city, must, under the law, be authorized and directed by ordinance of council, and when so directed, and that authorization and direction has been taken advantage of by the making of a contract, the city officials are concluded from making another contract upon the same subject-matter without affirmative and proper authorization and direction therefor. That being true the first contract in question could not legally be annulled and rescinded without affirmative action of council by ordinance in respect thereto. This we do not find to -have been done.
*92 The resolution of the board of control annulling the contract was sent to, received, and filed by council, and that was all that was done by council to annul the contract. The resolution directing republication cannot be construed as an action to rescind the contract upon the grounds set out in the resolution of the board of control. At most, it was an expression of opinion upon the part of council that the first contract was void because of fatally defective publication. It was not in any sense an action joining with the action of the board of control in rescinding the contract, or approving the reasons that prompted the board of control to attempt such rescission, namely, because of unavoidable delays and the impossibility of prompt performance.
It took, as we have said, the action of council by ordinance, the action of the director of public service, and the action of the board of control, to effectually make a contract, and, in the absence of specific legislative authority permitting the rescind- • ing and annulling of the contract, it would take the same joint and concurrent action of the same officials, acting with the same formality, to unmake it.
The deduction, therefore, is that such a contract, upon good and sufficient reasons, may be rescinded, but that the action taken in this case did not accomplish that end.
3. Was the second contract valid or invalid?
The conclusion arrived at in No. 2 has satisfactorily solved this question. The first contract being *93 valid when entered into, and not as yet rescinded, there was no reason or authority to make the second contract, and it must be held invalid.
4. The street to be paved is under the control of the city. The electric railway company has a right of user, which is joint, but not exclusive. The city owes a duty to the public to keep the streets in proper repair, and, having determined to pave a certain street, is obligated to the public to pave it in its entirety, or all of it that is included within the boundaries covered by such determination.
The fact that a railway company with its tracks occupies a part of the area, and that the law and the provisions of the franchise obligate the railway company to pave the part occupied by it, does not in any way relieve the city of its obligations to the public. Moreover, it is a distinct advantage to the city and the public that such an improvement be handled as one contract, under one head, at one time, with one set of workmen, etc. This would, without doubt, insure a higher quality of work and better general results.
In this case the easement of the railway company, so far as it relates to the payment of its proportionate share of the cost of the improvement is, by and with the consent of the railway company, placed in a relationship similar to that of abutting property. An arrangement of this nature is not in conflict with Section 6, Article VIII, of the Constitution of Ohio, because the primary obligation *94 to build this part of the improvement rests with the city, the same as does the building of any other part.

Judgment modified, and affirmed as modified.

Johnson, Wanamaker and Robinson, JJ., concur.
Marshall, C. J., Jones and Matthias, JJ., dissent from second and third propositions of the syllabus and from the judgment.